(C. D. 502)

General Dyestuff Corp. *v.* United States

United States Customs Court, First Division

(Decided May 23, 1941)

*E. R. Pickrell* (*Eugene A. Chase* of counsel) for the plaintiff.
· *Charles D. Lawrence,* Acting Assistant Attorney General (*Richard F. Weeks,* special attorney) for the defendant.

Before Brown, Tilson, and Dallinger, Judges; Brown, J., not participating

Dallinger, Judge: This is a suit against the United States, arising at the port of New York, brought to recover certain customs duties alleged to have been improperly exacted upon a particular importation invoiced as "glyecine A." Duty was levied thereon at the rate of 6 cents per pound and 30 per centum ad valorem under paragraph 2 of the Tariff Act of 1930 which reads:

Par. 2. Acetaldehyde, aldol or acetaldol, aldehyde ammonia, butyraldehyde, crotonaldehyde, paracetaldehyde; ethylene chlorohydrin, propylene chlorohydrin, butylene chlorohydrin; ethylene dichloride, propylene dichloride, butylene dichloride; ethylene oxide, propylene oxide, butylene oxide; ethylene glycol, propylene glycol, butylene glycol, and all other glycols or dihydric alcohols; monoethanolamine, diethanolamine, triethanolamine, ethylene diamine, and all other hydroxy alkyl amines and alkylene diamines; allyl alcohol, crotonyl alcohol, vinyl alcohol, and all other olefin or unsaturated alcohols; homologues and polymers of all the foregoing; ethers, esters, salts and nitrogenous compounds of any of the foregoing, whether polymerized or unpolymerized; and mixtures in chief value of any one or more of the foregoing; all the foregoing not specially provided for, 6 cents per pound and 30 per centum ad valorem.

It is claimed that said merchandise is properly dutiable at the rate of 25 per centum ad valorem under paragraph 5 of said act which reads:

PAR. 5. All chemical elements, all chemical salts and compounds, all medicinal preparations, and all combinations and mixtures of any of the foregoing, all the foregoing obtained naturally or artificially and not specially provided for, 25 per centum ad valorem.

While glyecine A is not mentioned *eo nomine* in said paragraph 2, the Government contends that it is included either under the provision therein for "all other glycols or dihydric alcohols" or under the provision for "ethers, esters, salts and nitrogenous compounds of any of the foregoing * * *."

A sample of the imported glyecine A was admitted in evidence as exhibit 1, and by agreement made by and between counsel for the respective parties a paper correctly setting forth the structural and empirical formula of said glyecine A was admitted in evidence as exhibit 2.

The plaintiff then offered in evidence the testimony of three witnesses. The first, William Carroll Wilhelm, a well-qualified analytical chemist, testified that he was familiar with the various products mentioned in said paragraph 2 of the Tariff Act of 1930; that he made chemical tests upon a sample of glyecine A which was taken from the same barrel as contained exhibit 1; that he made a nitrogen determination and found none; that he made a halogen test and found none, halogen being chlorine, radical bromine or iodine; that he burned a portion of some of the sample and found no ash, no residue, which eliminated the presence of any metallic salts; that he made a sulphur determination by breaking down the organic material with peroxide of sodium and precipitating the sulphur in the form of barium sulphate by barium chloride; that from the amount of barium sulphate he was able to calculate the sulphur content which amounted to 26 per centum; that he also made a carbon and hydrogen determination by combustion in which he found a carbon content of 38 per centum and a hydrogen content of 8 per centum, the oxygen content being determined by difference; that he also made a test for the "OH" or hydroxyl group by acetylation and found the number of "OH" or hydroxyl group to be two; that as a result he found glyecine A to contain four carbons, ten hydrogens, two oxygens, and one sulphate, which is the formula set forth in exhibit 2; that glyecine A is not mentioned in paragraph 2 of the Tariff Act of 1930; that it is not a glycol; that a glycol is an aliphatic hydrocarbon of the paraffin series in which two hydrocarbons are replaced by two "OH" or hydroxyl groups; that glyecine A does not conform to that definition because it contains sulphur; that a dihydric alcohol is the same as a glycol; that glyecine A is not a hydroxy alkyl amine because it contains no nitrogen which is

contained in all amines; that glycine A is not a alkylene diamine for the same reason; that it is not an elefin or unsaturated alcohol because glycine A is a saturated compound; that glycine A is not a homologue of any of the compounds mentioned in paragraph 2 of the Tariff Act of 1930; that it is not a polymer; that it is not an ether because an ether is an oxide of alkyl radicals or in other words it is an oxygen to which is attached the alkyl radical; that glycine A is not an ester because it cannot hydrolyze into alcohol or acid; that glycine A is not a nitrogenous compound because it contains no nitrogen; that it is not a mixture but a sulphide; that it is a chemical compound, being a substance made up of two or more elements which combine in direct different molecular proportions; that glycine A is not a salt, because when burned there was no residue, which eliminated any possibilities of metallic salts; and that glycine A is a single chemical compound.

The witness then testified in part as follows:

Judge DALLINGER. Counsel asked you about certain chemicals that are described in Paragraph 2. To clear the record, you have read that Paragraph?
The WITNESS. I have read it.
Judge DALLINGER. Did I understand you to testify this particular merchandise that is now before us as exhibit 1, is none of the things enumerated in paragraph 2?
The WITNESS. That is right.
Judge BROWN. There is one question I want to ask: Is there anything in Paragraph 2, that has sulphur in it?
The WITNESS. No.
Judge BROWN. So the presence of sulphur would eliminate this substance?
The WITNESS. That is right.

On cross-examination the witness testified in part as follows:

X Q. Now if in this exhibit 1, you had an oxygen instead of a sulphur, would you then consider exhibit 1, to be in the class of a glycol?—A. No.
Judge BROWN. And what instead of sulphur?
The WITNESS. Oxygen.

\*      \*      \*      \*      \*      \*      \*

X Q. If you had an oxygen in there instead of a sulphur, do you know what the name of that product would be chemically?—A. It would be an ether.

\*      \*      \*      \*      \*      \*      \*

Judge DALLINGER. Is there any other reason except the presence of sulphur?
The WITNESS. Well it is not in the paraffin series.

\*      \*      \*      \*      \*      \*      \*

Judge BROWN. In other words the structure, outside of the structure of sulphur, it is different from an ether?
The WITNESS. Yes.

The second plaintiff's witness, Ernest J. Kniepen, a highly-educated and well-qualified chemist, testified that at the present time he was engaged in technical research; that he had been familiar with glycine A for the last 20 years, having manufactured it a number of times since 1915; that its chemical name is beta ethanol sulphide; that it is used in making printing-dyestuffs; that he was familiar with all of the

chemical compounds enumerated in paragraph 2 of the Tariff Act of 1930; that glyecine A was none of them; that he had many years experience with glycols; that he had made dihydric alcohol; that glyecine A is not a glycol; that a glycol is a dioxy compound of the paraffin series; that ethylene glycol, propylene glycol, and butylene glycol all fall within the witness' definition of glycols, and that glyecine A does not; that the latter is not a dihydric alcohol, which consists of two hydroxyl groups in aliphatic or paraffin row uninterrupted; and that glyecine A was not a hydroxy alkyl amine because of the absence therein of nitrogen.

At this juncture the following colloquy took place:

Mr. WEEKS. In order to shorten this up, we claim, so that we can leave all these other things out, we claim that this importation is a glycol. We claim it is a dihydric alcohol, and we claim that it is an ether.

Judge BROWN. All three at once, or either one of the three?

Mr. WEEKS. Either one or the other, that is all we claim, so that it is not necessary to go into any other substance, if my adversary does not wish to do it.

Judge DALLINGER. I understand the Government agrees it is none of the other things in Paragraph 2.

Mr. WEEKS. Yes, we agree.

The witness then proceeded to testify that glyecine A was not an ether, for the reason that an ether has a carbon interrupted by oxygen linkage, whereas glyecine A is a chemical compound; and that all his answers would apply to the period previous to 1930.

On cross-examination the witness testified in part as follows:

X Q. As I understand it, it is the presence of this sulphur atom that leads you to the conclusion that it is not a dihydric alcohol?  *  *  *—A. Yes.

X Q. And is it also the presence of the sulphur atom in that carbon chain that leads you to the conclusion that this Exhibit 1, this glyecine A, is not a glycol?—A. Yes.

X Q. Now the presence of this sulphur atom in the carbon chain does that prevent the glyecine A from being a mono hydric alcohol?—A. Yes.

*  *  *  *  *  *  *

X Q. So that in spite of the sulphur, assuming that you substitute a hydrogen for one of the hydroxyl groups, this substance would be a mono hydric alcohol of a sulphide?—A. Yes.

*  *  *  *  *  *  *

X Q. Now Dr. Kniepen, coming back to this interpretation of the carbon chain, suppose your carbon chain was interrupted by an oxygen, instead of a sulphur, would your substance then be a glycol?—A. It would be ether.

X Q. Well would it be a glycol?—A. No.

X Q. No kind of a glycol?—A. Not at all.

The third plaintiff's witness, Carl Zeno Draves, another highly-educated and well-qualified chemist, at the present time national president of the American Association of Textile Chemists and Colorists, testified that as Chairman of the Publication Committee of that Association he had edited the portion of the Association's year-book dealing with a list of textile chemical specialties; that in prepar-

ing such list it was necessary for him to be thoroughly familiar with chemical nomenclature as used in the United States; that he was thoroughly familiar with both glyecine A, represented by exhibit 1, and with glycols; that glycol is a dihydric alcohol and is designated by the general chemical formula $CnH_2n(OH)_2$; that ethylene glycol corresponds to that general formula, the said formula being admitted in evidence as plaintiff's illustrative exhibit A.

The witness then testified that he was familiar with propylene glycol and butylene glycol, the structural formulas for which were admitted in evidence as plaintiff's illustrative exhibits B and C, respectively.

The witness was then shown exhibit 2 in which is set forth the structural formula of glyecine A, and he testified that the latter was not a glycol because it contained a sulphur atom in the center of the molecule which interrupts the carbon chain. He further testified that a dihydric alcohol is the same as a glycol, and that glyecine A was not a dihydric alcohol; that an ether is a dialkyl oxide; that glyecine A is not an ether because it is not a dialkyl oxide but a diethanol sulphide; that so-called "thio ether" is not an ether; that there is another propylene glycol structural formula which was admitted in evidence as plaintiff's illustrative exhibit D; that there are five additional butylene glycol structural formulas which were admitted in evidence as plaintiff's illustrative exhibit E; that glyecine A is a chemical compound because it corresponds to a formula, has a constant composition by weight, and cannot be separated by physical means without chemical decomposition; and that the definitions given by the witness were equally applicable to the period previous to 1930.

On cross-examination the witness, being shown the formula of the chemical compound glycol to wit, $CnH_2n(OH)_2$, testified in part as follows:

X Q. Do you know of any glycols that do not follow this general formula?—A. They would not be a glycol if they did not follow this formula.

X Q. What is your answer to my question, is it yes or is it no?—A. The answer is, no.

X Q. Would a phenyl ethylene glycol follow your general formula?—* * * A. It is not a simple glycol.

X Q. Then your answer is "No"?—A. No.

X Q. What kind of a glycol is it?—A. It is a glycol derivative, it is not a simple glycol.

X Q. In other words it is a substituted glycol, is that right?—A. Yes.

X Q. Well that does not answer to your general formula does it?—A. No.

X Q. Well then isn't the term glycol applied to things other than simple glycols shown in your formula?—A. Yes.

On redirect examination the witness testified that a substitute glycol was not a glycol.

On recross-examination the witness testified in part as follows:

R. X Q. Do you know of diethylene glycol?—A. Yes.

R. X Q. Is that a glycol?—A. No.

R. X Q. It is called a glycol, isn't it?—A. It is called a glycol by the manufacturer, but that does not mean the nomenclature of the American Chemical Society, would accept it as a glycol.

R. X Q. Are you testifying here as to what the nomenclature of the American Chemical Society deems correct?—A. That is the best authority I know in the United States.

R. X Q. Then is some of your testimony contrary to what the manufacturer calls things?—A. Sometimes the manufacturers use wrong names which are misleading.

R. X Q. So that if commercial practice among manufacturers wasn't in accord with that you have testified to, the manufacturer is wrong, is that right?—A. That is right.

The witness was then asked to draw a structural formula for diethylene glycol similar to exhibit 2, with the atoms strung out, which he did, the paper being admitted in evidence as illustrative exhibit F. The witness then proceeded to testify in part as follows:

R. X Q. Now that exhibit F, you have just drawn Doctor, is exactly the same as exhibit 2, is it not, except you have an oxygen atom, instead of a sulphur atom, and in place of a sulphur atom?—A. Yes.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

R. X Q. It contains 2 alcoholic groups, doesn't it?—A. Yes.

R. X Q. Well 2 alcoholic groups make a dihydric alcohol?—A. Not under the accepted definition of dihydric alcohol.

R. X Q. Accepted by whom, this Chemical Society of yours, or the manufacturers?—A. I would say by the general consensus of opinion in both the industry, and the American Chemical Society.

On redirect examination the witness testified in part as follows:

R. Q. Dr. Draves, exhibit F, illustrative exhibit F, what is the difference between that structural formula and those of the various glycols which you drew?

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

The WITNESS. The essential difference is that this structure contains in the center of the molecule an oxygen atom which is not included in the other formulas.

R. Q. Then do you consider exhibit F to be a glycol?

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

The WITNESS. No.

R. Q. The various compounds whose formulae are drawn on exhibits A to E, do you consider them to be all glycols?

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

The WITNESS. Yes.

The Government offered in evidence the testimony of Benjamin Talbott Brooks, another highly-educated and well-qualified chemist and the author of a book on chemistry in hydrocarbons. He testified that he had special experience with glycols, having manufactured the same and produced ethylene and propylene as well as thio diglycol; that he was particularly familiar with the properties of the latter on

account of its use as a raw material for the manufacture of mustard gas; that exhibit 2 contains the structural formula of the substance known in industry and in chemical literature as thio diglycol; that thio diglycol has the structure of a glycol and also of a dihydric alcohol; that the basis of his opinion is that it has two alcoholic hydroxyl groups, that the presence of a sulphur atom does not take it out of the class of a dihydric alcohol or a glycol for the reason that the presence of such sulphur atom in the middle of the molecule does not destroy the alcoholic or glycolic character of the substance; that this conclusion is supported by both academic and industrial chemists and is confirmed by all of the standard textbooks which he has examined.

On cross-examination the witness, being shown the paper which was admitted in evidence as plaintiff's illustrative exhibit G, testified in part as follows:

X Q. You are familiar with tartaric acid, are you not, as a chemist?—A. Yes.

X Q. I ask you if this represents the structural formula for tartaric acid?—Yes, that is correct.

X Q. Does that compound contain 2 alcoholic hydroxyl groups?—A. Correct.

X Q. Is that compound a glycol?—A. Yes.

X Q. Tartaric acid is a glycol?—A. Yes.

X Q. Is it an acid?—A. Yes.

X Q. When chemists speak of that compound, do they refer to it as a glycol or as an acid?—A. No, it is referred to as tartaric acid.

The witness then proceeded to testify that he was familiar with the compounds known, respectively, as diethyl tartrate, dihydroxyacetone, diethanolamine, and dioxyethyl sulphate, the structural formulas of which were admitted in evidence as plaintiff's illustrative exhibits H, I, J, and K, respectively, and that all of said compounds were glycols. In explanation of his answer the witness testified as follows:

Substances such as this may have one-half dozen scientific names. They may also have commonly accepted commercial names. As far as I know, this has no commercial name or commercial existence. The name given on this sheet is Beta Beta Dioxyethyl Sulphate, would be a correct chemical name. It would be equally correct to call this substance a Dithydric alcohol as having two perfectly characteristic alcohol hydroxyl groups. If I may be permitted to extend this answer, the same consideration applies to many of the other substances that we have been discussing here, for example, ethyl alcohol may be called "grain alcohol" which is the common commercial name. It may also be called ethyl alcohol. It may be called methyl carbinol, it may also be called mono hydroxy ethane, but if I asked at a bar for mono hydroxy ethane, I am afraid I would not get what I wanted.

The witness then continued his cross-examination as follows:

X Q. I hand you the final formula which purports to be the structural formula of Dimethoxytetraglycol, and ask you if that formula correctly represents that compound?—A. Yes, that is correct.

X Q. Is that a glycol?—A. No, it is not.

X Q. It is called a glycol, is it not?—A. Could be.

X Q. It could be what?—A. It could be called a glycol, but as a matter of fact, the correct name would be the one given here, which indicated it to be a glycol ether.

X Q. In other words, something can be called glycols which are not glycols, is that correct?—A. Well there may be many errors in nomenclature.

X Q. Now, Dr. Brooks, if I remember your testimony correctly it was that the glycol part of the name thio diglycol as applied to exhibit 1, and 2, was one of the reasons why you considered that compound to be glycol?—A. That is right.

X Q. Here is a compound which has the name glycol in its name, and you say it is not a glycol. So is that a very persuasive argument?—A. This compound contains no alcoholic hydroxyl groups whatsoever. Thio diglycol does. It contains 2 alcoholic hydroxyl groups. This compound has no alcoholic hydroxyl groups.

X Q. I would like to read you the definition of a glycol from Funk & Wagnalls New Standard Dictionary, 1939. Definition: "A diatonic alcohol, of the fatty group, having the formula $CnH_2n(OH)_2$." Is that formula, that definition, correct?—A. The formula is clear.

X Q. Do you agree with that definition?—A. I do not.

X Q. Why not?—A. It does not agree with chemical usage in our best known text books.

X Q. Are you familiar with the text book of organic chemistry by Bernthsen, revised by Sudborough?—A. Yes.

X Q. Do you consider that an authority on chemistry?—A. Yes.

X Q. On page 195 of this edition which was published in 1930, there is the major heading "Polyhydric alcohols", and there is the sub-heading "Dihydric alcohols, or glycols $CnH_2n(OH)_2$." The opening sentence is "Dihydric alcohols may be regarded as derived from the paraffins, by the replacement of two hydrogen atoms by two hydroxyl groups." Do you agree with that?—A. That only applies to the simpler members of the glycol series. That does not exclude necessarily glycols such as a phenylethylene glycol which is a typical glycol, and still contains a phenyl group.

*       *       *       *       *       *       *

X Q. Does ethylene glycol fall within that definition?—A. It does.

X Q. Does propylene glycol fall within that definition?—A. It does.

X Q. Does butylene glycol fall within that definition?—A. It does.

On redirect examination the witness testified in part as follows:

R. Q. Is it possible Dr. Brooks, to call complex chemicals by a simple name in every case?—A. It is not always possible, no.

R. Q. And in cases of substances which are glycols, does it also occur that those substances are something more than glycols?—A. Yes, you can have very complicated glycols.

*       *       *       *       *       *       *

R. Q. Then I take it "glycols" is a general term?—A. It is.

It appears from this record that three eminently qualified experts have testified that glycine A, the imported merchandise at bar, is not any of the chemical compounds which are enumerated in paragraph 2 of the Tariff Act of 1930. In the course of the hearing counsel for the Government specifically limited the Government's claim to the question whether the said glycine A was a glycol, a dihydric

alcohol, or an ether, agreeing that said glyecine A was none of the other chemical compounds enumerated in said paragraph 2.

All three of the plaintiff's witnesses gave it as their expert opinion that said glyecine A was not a glycol, a dihydric alcohol, or an ether, and gave their reasons for such opinion. On the other hand, one qualified chemist testified in behalf of the Government that in his opinion glyecine A was a glycol, and gave at length his reasons for his said opinion.

In view of the fact that three eminently qualified chemical experts have testified most emphatically that glyecine A was not a glycol, and their testimony is supported by dictionary definitions and recognized chemical authorities, it is unfortunate that the testimony of the single Government expert, who directly contradicted the testimony of the plaintiff's witnesses, was not corroborated by other expert testimony.

We are inclined to agree with the statement in plaintiff's reply brief that the defendant's witness Brooks, on cross-examination, experienced some difficulty in supporting his view that glyecine A is a glycol. It is to be noted that in his redirect examination he explained his testimony with the statement that "the term glycol itself, unless further qualified refers to these simple glycols."

While it is true that many chemical compounds containing two hydroxyl groups may show some properties of glycol, this does not make them all glycols, as insisted upon by the witness Brooks. Nor are we impressed with the statement in defendant's brief that the congressional history of paragraph 2 of the Tariff Act of 1930 tends to support his contention. Counsel refers particularly to certain statements made by counsel for the American industry before the Committee on Ways and Means of the House of Representatives. In our opinion, however, such statement before a congressional committee or debates in Congress are not appropriate sources of information from which to discover the meaning of the language in a statute. *United States* v. *Trans-Missouri Freight Association*, 166 U. S. 290; *Wilbur-Ellis Co.* v. *United States*, 26 C. C. P. A. 403, C. A. D. 47.

But even if such statements were to be considered it would not alter the situation. It is true that prior to the Tariff Act of 1922 the Carbon and Carbide Chemical Corporation asked Congress for protection on products obtained, derived, or manufactured from hydrocarbon gases, and the Congress saw fit to limit paragraph 2 to certain specified chemical compounds, and glyecine A was not included in said paragraph as enacted either under that name or under the name of thio diglycol given it by the Government's witness Brooks. As a matter of fact the draft of paragraph 2 which was submitted by the

Carbon and Carbide Chemical Corporation, and which was adopted almost verbatim by the Committee on Ways and Means and incorporated in the Tariff Act of 1930, was drawn with great care to cover all chemical compounds in which that corporation was interested, 25 of such compounds being specifically mentioned by name in said paragraph besides 19 covered by the general terms of the paragraph. Thus, where six specific names would have served, 25 were used. It is certainly significant that glycine A, having been well-known for many years, and, as Government witness has testified being used in the manufacture of mustard gas, would certainly have been covered by appropriate language had it been desired to include it in said paragraph 2.

Moreover, to include glycine A in paragraph 2 would mean to enlarge the scope of said paragraph by reading into it articles not intended to be included, and adding to it chemicals of an inorganic nature such as sulphur, whereas every chemical compound named or provided for in said paragraph 2 is organic.

. Furthermore, under the theory advanced by counsel for the Government, if Congress had not provided for numerous chemicals elsewhere . they would be included in paragraph 2 as glycols. Such would include tartaric acid (mentioned in paragraph 1), cream of tartar and Rochelle salts (mentioned in paragraph 9), citrate of lime (mentioned in paragraph 48), potassium bitartrate (mentioned in paragraph 9), and calcium tartrate (mentioned in paragraph 1611). These are mainly salts of an organic nature, and yet each contains two aliphatic hydroxyl groups.

Under the Government's theory there is a conflict between the provision for glycols in paragraph 2 and other general provisions. For instance, paragraph 5 of the 1930 law provides generally for salts. It would be natural to include therein salts of tartaric acid and the salts of lactic and citric acids with bivalent metals such as calcium, ferrous iron, magnesium, zinc, and others. It would be natural to include under paragraph 37 the esters of tartaric acid, such as diethyl tartrate. Each of these compounds contains two aliphatic hydroxyl groups. But it certainly was never the intention of Congress to invade these paragraphs and probably others by means of the provision for glycols or dihydric alcohols. To be sure, the compounds mentioned contain two hydroxyl groups, but they are far different from what is within any ordinary conception of a dihydric alcohol.

It is a fundamental and well-established principle of statutory construction that all laws are to be given a sensible construction and that absurd and ridiculous results should be avoided. *United States* v. *Ryan*, 284 U. S. 167, 175, and *Hensel* v. *United States*, 3 Ct. Cust. Appls. 117, T. D. 32366.

In short, the Government's interpretation of paragraph 2 would so broaden the paragraph beyond its reasonable scope that it would include all acids, esters, aldehydes, ketones, and salts, whether inorganic or organic, thus including literally thousands of chemical compounds which are never considered, nor intended to be considered, as glycols or dihydric alcohols.

On the entire record we find as a fact and conclude as a matter of law that glycerine A, the imported merchandise at bar, is not a glycol, a dihydric alcohol, or an ether, as alleged by the plaintiff, and therefore is not within the purview of paragraph 2 of the Tariff Act of 1930; but that it is a chemical compound not specially provided for within the meaning of paragraph 5 of said act and as such dutiable at the rate of 25 per centum ad valorem, as alleged by the plaintiff. That claim is therefore sustained; but as to all other merchandise the claims are overruled. Judgment will be rendered accordingly.